UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-cr-00578-APM** |
| v. | : | |
| | : | |
| ZACHARY WILSON, | : | |
| | : | |
| Defendant. | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Zachary Wilson ("Wilson") to 14 days incarceration, three years' probation, and $500 restitution.

I.    **A Sentence Imposed for a Violation of 40 U.S.C. § 5104(e)(2)(G) May Include Both Incarceration and Probation**

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561(a)(3) thus states the general rule that "imposition of both probation and straight imprisonment" in the same sentencing hearing is not permitted. *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *United States v. Anderson,* 787 F. Supp. 537, 539 (D. Md. 1992).

This general prohibition against sentences that combine continuous incarceration and probation does not apply, however, where the defendant is sentenced for a petty offense. *See* 18 U.S.C. § 3561(a)(3); *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009). In *Posley*,

1

the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Posley*, 351 F. App'x at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3651(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809. Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. See 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.

On Friday January 7, 2022, Judge Colleen Kollar-Kotelly sentenced a Capitol breach defendant convicted under 40 U.S.C. § 5104(e)(2)(G) to "the custody of the Bureau of Prisons for a term of 90 days" followed by a term of "36 months of probation." *See United States v. Virginia Marie Spencer*, Criminal Docket No 1:21-cr-00147-CKK-2, trans. 46:25.

However, on January 19, 2022, Judge Kollar-Kotelly reversed this sentence and imposed only a term of incarceration. *Id.* at Docket No. 70. She noted in that opinion,

> [A] plain reading of the statutory sections at issue – 3551(b) and 3561– leads to the conclusion that a district court must choose between probation and imprisonment when imposing a sentence for a petty offense. This Court is unpersuaded by the contrary holding in *Posley*, a case cited by the Government, as it neither considers Section 3551 nor is it binding precedent. *Id.*

Additionally, on January 19, 2022, Judge Thomas F. Hogan sentenced a Capitol breach defendant named Jacob Kyle Wiedrich, ECF Docket No. 1:21-cr-581. In that hearing, Judge Hogan specifically held there was insufficient statutory authority to impose a split sentence.

II.   **Introduction**

The defendant, Zachary Wilson, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Wilson pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.   As explained herein, the government's recommended sentence is appropriate in this case because: (1) Wilson entered the Capitol building through a broken window near the Senate Wing doors after observing other rioters overcome police resistance to break into the building ; (2) he claimed to be one of the first people inside the building; (3) he posted pictures and videos he took of the Capitol breach to Facebook; (4) he entered a particularly sensitive area, the office of Speaker of the House Nancy Pelosi and took a video inside; (5) he traversed almost the entire length of the U.S. Capitol, exiting at the doors at the south end of the building; and (6) he lied to FBI agents about his participation in the riot.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the certification vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan at sentencing). Here, Wilson's participation in a riot that actually succeeded in halting the Congressional certification

combined with his behavior and actions renders a significant sentence both "sufficient, but not greater than necessary to comply with the purposes of" the federal sentencing regime in this case. *See* 18 U.S.C. § 3553(a).

### III.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Zachary Wilson's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Wilson drove to Washington D.C. with his wife and co-defendant Kelsey Wilson to attend the rally in support of President Trump, which was scheduled for the following day.  Wilson told investigators the reason he went to D.C. was because he wanted his "voice to be heard" as he was a strong supporter of President Donald Trump.  On January 6, 2021, Wilson wore a red, white and blue knit cap with "Trump" on it, and a red jacket, with a white surgical mask covering his mouth and nose.  Kelsey Wilson wore white, yellow, and black striped knit cap, grey jacket, and grey sweatpants.

After the rally, Wilson and his wife walked with a large group of people towards the United States Capitol Building.  Once he reached the Capitol grounds, Wilson began recording videos on his phone.

As the Wilsons made their way toward the Capitol building, Wilson captured video showing a crowd and one rioter washing his eyes with water.  Someone near Wilson (or Wilson himself) stated, "Watch out cuz this is where people are getting pepper sprayed."  A screenshot of Wilson's video is below.



*Figure A*

The next video recorded by Wilson shows a crowd pushing toward the Senate Wing doors with a group of officers (seen on the left wearing dark clothes) trying to prevent entry.   A screenshot of Wilson's video is below.



*Figure B*

Wilson first appeared on CCTV surveillance videos entering through a broken window immediately next to the Senate Wing door entrance at approximately 2:24pm. This doorway had been defended by police who were overwhelmed by the rioters.



*Figure C*

Almost immediately after Wilson entered the window, he reunited with his wire and co-defendant Kelsey Wilson who entered through the Senate Wing doors.  From that point on, they remained together.



*Figure D*

CCTV next captured the Wilsons traveling toward Nancy Pelosi's office around 2:32pm.



*Figure E*



*Figure F*

Both Wilsons entered Speaker Pelosi's office. It was clear this was an office because it contained sofas, a desk, decorations, and personal effects. Once inside, Wilson recorded a short video. The Wilsons spent approxiamtely 5 minutes in this office area. There is no evidence that either defendant engaged in any destruction or theft inside the office. Screenshots of Wilson's video, admittedly grainy, are below:



*Figures G-H*

CCTV next captured the Wilsons traveling through the Rotunda at approximately 2:38pm.



*Figure I*

Officer body-worn camera next captured the Wilsons traveling through the Crypt at approximately 2:42pm. They appeared to follow the commands of the officers.



*Figure J*

CCTV next captured the Wilsons traveling through the House Wing at approximately 2:43pm.



*Figure K*

One minute later, CCTV captured the Wilsons exiting the Capitol through the South Doors.



*Figure L*

Officer body-worn camera captured the same exit.  The Wilsons spent a total of approximately 20 minutes inside the Capitol building.



*Figure M*

*FBI Interview*

When FBI agents knocked on his door on January 18, 2021, Wilson voluntarily submitted to an interview.  During that interview, he stated that his intent in going to D.C. was to peacefully show his support for President Trump and attend the rally.  Wilson stated that after the rally he walked with Kelsey Wilson to the Capitol grounds but heard what he thought were pops from tear gas canisters being used by police in an attempt to control the crowd.  Accordingly, he said they decided to leave.  Wilson stated that he never crossed any barricade lines and never knowingly trespassed on any property.  This was, of course, false.

On January 20, 2021, FBI agents again interviewed Wilson at his home because this time agents had reviewed Wilson's Facebook page and seen videos he had posted about being inside the Capitol and specifically inside Speaker Pelosi's office.  They warned Wilson about the consequences of lying to a federal agent, which he said he understood.  Nonetheless, Wilson stated

that his Facebook posts were "lies" that he made up because he wanted to "look cool".  Wilson, again, stated that he never set foot in the Capitol, nor did he ever have any intention of entering the Capitol.

Later that day, Wilson called the FBI agents and stated that he "needed to tell the truth" and come clean about his actions on January 6, 2021 because he had lied to the agents.  Agents then traveled back to Wilson's home that evening and conducted a third interview.  This time Wilson admitted that he had entered the Capitol building as well as Speaker Pelosi's office.  Wilson stated that he was part of the initial push inside the building.  But Wilson lied again and stated that Kelsey Wilson had not entered the Capitol and that she had stayed outside.  To their credit, the Wilsons made an effort to get the FBI the pictures and videos that took at the Capitol.

*Social Media Posts*

Shortly after the attack on the Capitol, Wilson used Facebook to publicly post pictures and videos had had taken at the Capitol, including the video taken inside Speaker Pelosi's office.  In discussing his activities on January 6th, he had a message exchange with an individual as shown below:



*Figure N*

*The Charges and Plea Agreement*

On February 12, 2021, Wilson was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2). On February 19, 2021, he was arrested at his home in Missouri. On September 14, 2021, Wilson was charged by a one-count Information with 40 U.S.C. § 5104(e)(2)(G). On September 27, 2021, he pleaded guilty to the Information. By plea agreement, Wilson agreed to pay $500 in restitution to the Architect of the U.S. Capitol.

### IV.      Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the government's recommendation.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms. Indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court

should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, the Court must assess such conduct on a spectrum. In determining a fair and just sentence on this spectrum, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Wilson personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Wilson from most other misdemeanor defendants. Wilson's lack of violence and property destruction explains why he was charged only with, and permitted to plead to, a misdemeanor rather than a felony.

On January 6th, Wilson trespassed onto the Capitol grounds; he witnessed another rioter who had been hit with "pepper spray"; he entered the Capitol building through a broken window near the Senate Wing doors; he entered Speaker Pelosi's office; he traveled through the Rotunda; he traveled through the Crypt; he traveled through the House Wing; and he exited through the South Doors. The Wilsons spent approximately 20 minutes inside the building and traveled across almost its entire length. Shortly after the riot, Wilson took to social media to show off his criminal conduct. He also minimized his conduct and outright lied to the FBI regarding the extent of his activities during the riot.

The trauma to experienced by the members of Congress and Speaker Pelosi's staff is significant. A group of Speaker Pelosi's staffers barricaded themselves behind a door and hid under a desk for more than 2 hours.

As for remorse or contrition, only after twice lying to FBI agents about his participation in the riot, Wilson finally told the FBI he realized that what he did at the Capitol on January 6, 2021 was wrong. But even then, he continued to lie to the agents about the involvement of his wife.

Accordingly, the nature and the circumstances of this offense support the government's recommendation.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Wilson's criminal history consists of a DUI conviction for which he appears to have been on probation during the instant offense. He also has several arrests related to unlawful use and possession of controlled substances. Wilson has been compliant with his conditions of pre-trial release in this case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The

violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

[D]emocracy requires the cooperation of the governed. When a mob is prepared to

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

> attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The government acknowledges that Wilson ultimately accepted responsibility early by entering into this plea agreement.  On the other hand, his lies to the FBI on two occasions, coupled with his statements on social media, show a lack of remorse and underscore the need for specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[2] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[3] "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 (statement of Judge Lamberth at sentencing).

The sentencing courts have already made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in more aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

---

[2] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[3] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he or she remained inside, the nature of any statements he or she made (on social media or otherwise), whether he or she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2.  That photograph has become notorious likely for exactly this reason,

because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the intermittent 20-days incarceration (consecutive weekends) and 24-month probation sentence imposed by Judge McFadden in *United States v. Andrew Ericson*, 1:21-cr-00506-TNM.   In that case, the defendant entered Speaker Pelosi's conference room and office space; trivialized the level of his intrusion by posing with his feet on the Speaker's conference room table and taking a beer out of a mini refrigerator; saw police officers overrun by the crowd of rioters; and recorded his presence in and around the Capitol and posted it on Snapchat while cheering on the criminal activity he was witnessing.

The Court may also consider the 90-day incarceration sentence imposed by Judge Kollar-Kotelly in *United States v. Virginia Marie Spencer*, 1:21-cr-147.   In that case, the defendant entered the Senate Wing door; joined the crowd that surged past the police holding the Crypt; entered the suite of offices assigned to Speaker Pelosi; joined another crowd that formed outside the House of Representatives Chamber that attempted to enter that Chamber while lawmakers were still trapped inside; witnessed violence against law enforcement officers yet continued to participate in the riot; and she minimized her conduct to the FBI when interviewed.

Likewise, the Court may also consider *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room.   Judge Boasberg sentenced the defendants each to 45 days of incarceration.

The Court may also consider the 14-day incarceration sentence imposed by Judge Chutkan

in *United States v. Stephanie Danielle Miller*, 1:21-cr-00266-TSC.  In that case, the defendant entered through a window by the Senate Wing door; traveled through the Crypt and past the House Wing; and made statements after January 6 showing pride rather than remorse or contrition for her criminal conduct.  For example, she stated, "I enjoyed every part of what we did and was a part of. I honestly wouldn't have went if it weren't for brandon lol but It was an experience for sure".

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, several of those factors support a sentence of incarceration.. Balancing these factors, the government recommends that this Court sentence Wilson to 14 days incarceration, three years' probation, and $500 restitution. Such a sentence protects the community, promotes respect for the

law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By: _____
JACOB J. STRAIN
Utah Bar No. 12680
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530